STATE OF NEBRASKA, APPELLEE, V. JON M. RICHARD, APPELLANT.

424 N.W.2d 859

Filed June 17, 1988.   No. 87-713.

Jerry L. Soucie, for appellant.

Robert M. Spire, Attorney General, and Jill Gradwohl Schroeder, for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

After trial to a jury the defendant, Jon M. Richard, was convicted of robbery, use of a weapon in the commission of a robbery, and felon in possession of a firearm. He was sentenced to 5 to 12 years on count I, 2 to 5 years on count II, and 1 to 2 years on count III, the sentences on counts II and III to run concurrently and to run consecutive to the sentence on count I.

The defendant has appealed and contends the trial court erred in failing to suppress the in-court identification of the defendant by the witness Shaun Adams, in allowing the State to examine the witness Scott Schneider concerning his prior conversation with a detective, in allowing the State to impeach the witness Gregory Merryman concerning a prior identification of the defendant, and in allowing the State to mislead the jury concerning the immunity granted to the witness Russell Kreinbrook.

The record shows that on September 30, 1986, at approximately 9:30 p.m., Shaun Adams, Gregory Merryman, and Theresa Oakeson were working at the Taco John's restaurant, located at 1110 South Street in Lincoln, Nebraska, when a masked gunman entered through the rear entrance of the establishment and demanded money. According to the employees, the robber told them to get the money from the cash register, at which time Oakeson and Adams began placing the money in a sack. After they emptied the cash register, the robber ordered the employees to get the money from a safe, which was unlocked and located directly beneath the cash register. Adams then took the sack of money to the robber, during which time he concentrated on observing the robber so as to be able to provide an accurate physical description to the police.

After receiving the money, the robber left through the rear entrance and headed north. The employees telephoned police, and shortly thereafter officers arrived at the scene. Adams provided a physical description of the assailant to the police.

The following day, the defendant was arrested and taken to the police station, where he was questioned about the robbery. While in custody, photographs were taken of the defendant and approximately $200 was found in his wallet. After about 3 hours the defendant was released from custody. That same day, investigating officers assembled a photographic lineup, which included a photograph of the defendant, and presented the photographs to Adams. After reviewing the photographs, Adams identified the defendant as the robber. Adams said that the eyes of the individual in the photograph were identical or very close to those of the person who committed the robbery and that the hair was the same length and the same color, and

also noted similarities in his complexion. Oakeson was unable to identify the assailant, and Merryman was unsure of the robber's identity.

After a preliminary hearing, the defendant filed a motion to suppress "any and all evidence, observations, or things of whatever type that were seized from the Defendant, Defendant's person, or place in which the Defendant had a reasonable expectation of privacy" because, according to the defendant, his arrest was warrantless and lacked probable cause. Additionally, the defendant moved to suppress in-court and out-of-court identifications of the defendant on the basis that photographs taken of the defendant while in custody were taken in violation of his 4th and 14th amendment rights. The trial court found that the defendant's arrest was illegal and ordered the evidence seized pursuant to the arrest, including the photographs, suppressed. The trial court did not order the in-court identification of the defendant by Adams suppressed because the identification was found to be independently based and not influenced by the pretrial photo display.

The defendant asserts through his first and second assigned errors that the in-court identification of the defendant by Adams was tainted and should have been suppressed. The defendant argues that the taint arose from two sources—one being the prior identification of the defendant at the preliminary hearing, and the other being the identification made after Adams viewed the photographic lineup.

In regard to the identification at the preliminary hearing, the defendant alleges that the scenario constituted a suggestive one-on-one showup, where the only people involved were the county attorney, defense counsel, and the defendant, who was in custody of the sheriff's deputy. The defendant argues that the suggestive confrontation at the preliminary hearing was the basis of Adams' trial identification of the defendant.

The usual definition of a showup is that it is a one-on-one confrontation where the witness views only the suspect. Additionally, a showup is commonly "conducted at the scene of the crime, shortly after the arrest or detention of the suspect and while the incident is still fresh in the witness' mind." 19 Am. Jur. Proof of Facts 2d *Pretrial Identifications* § 2 at 442-43

(1979).

In *Holmes v. State*, 10 Md. App. 253, 269 A.2d 175 (1970), the victim of a robbery identified the defendant as the assailant by way of photographs and again identified the defendant at the preliminary hearing. The defendant contended that the preliminary hearing identification violated his due process rights. The court rejected this claim and held at 257-58, 269 A.2d at 177:

> Evidence of an extrajudicial identification is admissible when made under circumstances precluding the suspicion of unfairness or unreliability and where the out-of-court declarant is present at the trial and subject to cross-examination whether or not the out-of-court declarant made a positive in-court identification. . . . We see nothing in the record here compelling the conclusion that the extrajudicial identification was impermissibly suggestive. It was made at a preliminary hearing at which appellant was represented by counsel and under the impartial eye of the presiding judge. . . . As far as is disclosed by the record the identification procedure at the preliminary hearing was in substance no different than the normal procedure under which a judicial identification is made during a trial on the merits.

(Citations omitted.)

The defendant in *Minor v. State*, 437 So. 2d 651 (Ala. Crim. App. 1983), asserted a claim similar to that made by the defendant in this case when he moved to suppress an in-court identification on the basis that the identification constituted a "counselless line-up." *Id.* at 654. The victim had not identified the defendant as the perpetrator until the day before trial. The following day she positively identified the defendant in court. The court found the lack of identification by the victim prior to trial was not controlling and said:

> It is true that the witness did not give a prior description of the defendant, but this is not sufficient in the opinion of this court to eliminate the testimony of this witness. Reliability of the testimony of the witness in the identification process is the "linchpin" in determining the admissibility of identification testimony.

*Id*. Additionally, the court rejected the defendant's assertion that the in-court identification constituted a lineup: "We do not think that this is a 'line-up' contemplated by the courts in the cases which lay down the rules to be followed for the protection of rights of the accused." *Id*. at 655.

It is improper to characterize the preliminary hearing in this case as a one-on-one showup. It was not a hearing held for purposes of identification. At the time of the hearing, 2 months had passed since the robbery, and during that time, Adams had provided detailed physical descriptions of the robber. The fact that the preliminary hearing was the first face-to-face confrontation between the defendant and the victim is not controlling. Adams' previous descriptions of the defendant and his testimony provided sufficient indicia of reliability to negate any impropriety or suggestiveness that the defendant contends occurred at the preliminary hearing.

The U.S. Supreme Court in *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), held: "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . . ." See, also, *Foster v. California*, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969). Implementation of the totality of the circumstances approach

> permits the admission of the confrontation evidence if, despite the suggestive aspect, the out-of-court identification possesses certain features of reliability. . . . This . . . approach . . . is ad hoc and serves to limit the societal costs imposed by a sanction that excludes relevant evidence from consideration and evaluation by the trier of fact.

*Manson v. Brathwaite*, 432 U.S. 98, 110, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

Individual defendants appear to have due process claims whenever the likelihood of misidentification becomes greater than the assurances of reliability. As a result, suggestive confrontations have met with disapproval because "they

increase the likelihood of misidentification . . . ." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). However, "[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson, supra* at 432 U.S. at 106.

In *Biggers, supra,* the Court set forth factors to be considered in evaluating the likelihood of misidentification:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

409 U.S. at 199-200. See, also, *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986). It is against these factors that we are to weigh the "corrupting effect of the suggestive identification itself." *Manson, supra* at 432 U.S. at 114.

A review of the *Biggers* factors leads to the conclusion that although the identification of the defendant at the preliminary hearing may have taken place under suggestive conditions, Adams' previous observation and description of the defendant was reliable and negated any substantial chance of misidentification.

(1) Opportunity to view the criminal. Not only did Adams view the defendant from a distance of 6 to 7 feet, he also was within an arm's length of the defendant at one point during the robbery. The victim was specifically asked at trial about his ability to observe the defendant:

Q. At some point in time during the commission of the robbery on September 30th of last year, did you attempt to start trying to make some specific observations about the robber?

A. Yes, I did.

Q. When did you start doing it?

A. As I was bringing the money back mainly. It started going through my head to think —

Q. Why did you decide to do that?

A. Because of the prior robbery.

(2) Degree of attention. Adams' statement shows that he was not a casual observer but, rather, that his attention was focused on observing the physical characteristics of the defendant.

(3) Accuracy of prior description. Adams provided a physical description to police immediately following the robbery. The record does not show any discrepancies between observations made by Adams during the robbery and the actual physical characteristics of the defendant.

(4) Degree of certainty. The degree of certainty can best be inferred from the fact that at no time did Adams fail to identify the defendant as the perpetrator, nor did he identify any individual other than the defendant as the person responsible for the crime. In his deposition taken after the preliminary hearing Adams stated the following:

Q. What was it about it at the preliminary hearing that made you testify that that was the man that robbed you? What about his appearance that struck you?

A. I saw his physique from the back. I didn't even see his face till I walked up and sat down in the witness chair. When I sat down he was sitting up there, and I saw the physique. But when I walked by him and saw his face it was something about his face or eyes or something that I was just positive that, you know, that was the man who I had seen.

. . . .

A. Well, you know, his physique and everything were right. But I think the thing that made me sure of it was his eyes. His around his eyes features that, you know — it, just something about him made me go, that's him, you know.

(5) Length of time between crime and confrontation. The confrontation and identification at the preliminary hearing occurred 2 months after the crime. The testimony of Adams at his deposition shows the comparisons he made between the defendant and the robber.

The *Biggers* factors go to the matter of a victim's independent recollection of the identity of the perpetrator. The rule which is

applicable in this case is that an in-court identification should not be suppressed if based on independent recollection untainted by the intervening identifications. *United States v. Crews,* 445 U.S. 463, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980). In *Crews,* the Court held that the defendant's illegal arrest did not render the victim's ability to give accurate identification testimony invalid:

> Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber. No part of this process was affected by respondent's illegal arrest. In the language of the "time-worn metaphor" of the poisonous tree, *Harrison v. United States,* 392 U. S. 219, 222 (1968), the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned.
>
> This is not to say that the intervening photographic and lineup identifications— both of which are conceded to be suppressible fruits of the Fourth Amendment violation— could not under some circumstances affect the reliability of the in-court identification and render it inadmissible as well. Indeed, given the vagaries of human memory and the inherent suggestibility of many identification procedures, just the opposite may be true. But in the present case the trial court expressly found that the witness' courtroom identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record. In short, the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police conduct committed long after she had developed that capacity.

445 U.S. at 472-73.

The defendant's argument that the in-court identification was tainted as a result of the photographs taken of the defendant during his illegal arrest fails for the same reasons. The record supports the finding of the court that the

observation made of the defendant during the commission of the robbery was the basis for the subsequent identifications.

The third and fourth assigned errors relate to alleged impeachment efforts of the prosecution. First, the defendant contends that during the direct examination of Scott Schneider by the State, inadmissible hearsay statements, in the guise of impeachment, were received in evidence. Schneider was an acquaintance of the defendant whose testimony was compelled after he was found to be a material witness. Schneider's testimony related to conversations with the defendant about the robbery and his motorcycle, which was to be used as the getaway vehicle.

Essentially, the defendant contends that the trial court erred in allowing the State to call and impeach its witness Scott Schneider for the purpose of introducing inadmissible hearsay evidence. Neb. Rev. Stat. § 27-607 (Reissue 1985) allows an attack on the credibility of a witness by any party, including the party calling him. However, as stated by this court in *State v. Brehmer*, 211 Neb. 29, 44, 317 N.W.2d 885, 893 (1982),

> "The rule allowing a party to impeach his own witness may not be used as an artifice by which inadmissible matter may be gotten to the jury through the device of offering a witness whose testimony is or should be known to be adverse in order, under the name of impeachment, to get before the jury for its consideration a favorable ex parte statement the witness had made."

Furthermore, where "the need for impeachment is small or nonexistent and the danger that the prior inconsistent statement will be considered substantively is great, the statement should be excluded." *State v. Marco*, 220 Neb. 96, 101, 368 N.W.2d 470, 474 (1985).

Before trial, the State moved to compel Schneider's attendance at trial as a material witness. An affidavit filed in support of the motion recited, in part, the following:

> Detective Larry Barksdale of the Lincoln Police Department reported to Jan W. Sharp that on November 6, 1986 he interviewed Scott Schneider regarding his knowledge of the above described robbery. Scott Schneider told Detective Barksdale that either on the day

of the robbery of Taco John's or the day before the robbery that Jon Richard asked Scott Schneider to drive Jon Richard's motorcycle for him *during the commission of a robbery*. Scott Schneider stated that Jon Richard told him that all he would have to do is park about a block away by an alley near a store and let the motorcycle run. Scott Schneider stated that Jon Richard said that he, Jon Richard, would go in and do the robbery and that he would come back out and get on the motorcycle and they would drive away. Scott Schneider stated Jon Richard told him that it would only take 5 or 10 minutes and that he was going to commit the robbery at a place that had a bunch of "young kids" working there. Jon Richard told him that he would "stick a gun in their face" and he would just be "in and out." Scott Schneider told Detective Barksdale that he refused to take part in the robbery and advised Jon Richard of that fact.

Jan W. Sharp further deposes and states that he has made several attempts to compel Scott Schneider's attendance at various court hearings that have been held in this matter. On November 26, 1986 the State filed a praecipe for subpoena asking that the Clerk of the County Court of Lancaster County, Nebraska issue a subpoena directing Scott Schneider to appear and testify at the preliminary hearing set for December 1, 1986. The court records in the above-entitled matter indicate that Scott Schneider was personally served with a subpoena on November 29, 1986, however, he *failed to appear at the preliminary hearing* on December 1, 1986 or at the continuation of that hearing on December 19, 1986. Jan W. Sharp deposes and states that he received a phone call from Scott Schneider sometime after November 29, 1986, but prior to December 1, 1986. Scott Schneider informed Jan W. Sharp that *he would refuse to testify against Jon Richard*.

Jan W. Sharp further deposes and states that the above-entitled matter was tentatively called for trial during the jury term commencing on April 6, 1987. The court records indicate that on April 3, 1987 Scott

Schneider was personally served with a subpoena directing him to appear in District Courtroom No. 2 on April 19, 1987 at 9:00 a.m. to give testimony in this matter. Jan W. Sharp deposes and states that Scott Schneider *did not appear pursuant to that subpoena* and further that Scott Schneider telephoned Jan W. Sharp after being served on April 3, 1987 and informed Jan W. Sharp that *he would refuse to testify against Jon Richard*. Jan W. Sharp informed Scott Schneider that the above-entitled matter would probably be called for trial during the jury term commencing on May 11, 1987 and asked Scott Schneider to pick up a subpoena at the Sheriff's Office requiring him to appear at that jury term since Jan W. Sharp was unaware of Scott Schneider's address at that time. Although *Scott Schneider continued to maintain that he would not testify against Jon Richard* he did state that he would stop by the Sheriff's Office and pick up the subpoena.

The court records in the above-entitled matter indicate that a praecipe was filed by the State on April 14, 1987 requesting that a subpoena be issued directing Scott Schneider to appear in District Courtroom No. 2 on May 11, 1987 at 9:00 a.m. to give testimony in this matter. Jan W. Sharp deposes and states that on or about May 11, 1987 he telephoned the Lancaster County Sheriff's Office and was advised by that office that *Scott Schneider never picked up the final subpoena*.

(Emphasis supplied.)

The pretrial conduct and statements of Schneider established that he was opposed to *testifying* against the defendant. His repeated refusals to honor subpoenas, as well as numerous phone calls made to the prosecutor, all tend to establish the fact that he did not want to testify. However, after Schneider was found to be a material witness and his testimony was compelled, the State had a reasonable expectation that he would testify in conformity with his previous statements to Detective Barksdale. At no time did Schneider indicate that he would perjure himself if forced to take the stand. After Schneider was compelled to appear and to testify, it was not

beyond reason for the State to assume that after he was placed under oath and made subject to the penalties of perjury, he would testify consistent with his statements to police.

It is obvious that Schneider was a hostile witness. As such the State was permitted to ask leading questions. *Turner v. Welliver*, 226 Neb. 275, 411 N.W.2d 298 (1987); *State v. Brown*, 220 Neb. 849, 374 N.W.2d 28 (1985).

In fact, Schneider admitted everything except that the defendant had asked him to drive the motorcycle in connection with the robbery. Schneider's testimony revealed that he at least suspected there was some illegal purpose behind the defendant's request for him to drive the motorcycle.

The defendant also argues that there was error by the trial court during the examination of Gregory Merryman by the State. Merryman was an employee of Taco John's who was on duty at the time of the robbery. Following the robbery, Merryman was unable to identify the defendant in a photographic lineup. Although Merryman was acquainted with the defendant and had seen him on several occasions prior to the robbery, he told the police that he did not know or have an opinion as to who was responsible for the robbery.

At some time after the robbery, Merryman came in contact with the defendant and made comparisons between the robber and the defendant, at which time he "started thinking it was him." Merryman stated that at this time he was not positive that the defendant was the robber, and, in fact, when talking to the police shortly after making the comparisons, Merryman said he did not know if the defendant was involved. In that same conversation, however, Merryman eventually admitted that he believed the defendant could have been the robber and explained at trial that his reluctance to disclose this information was because of a previous threat made to Merryman by the defendant.

There were numerous objections during the testimony of Merryman, most of which were based on questions of relevancy. On appeal, however, the defendant challenges the admission of the testimony on grounds of improper impeachment, but the arguments in his brief relate not to impeachment but to issues of relevancy. Neb. Rev. Stat.

§ 27-103 (Reissue 1985) of the Nebraska Evidence Rules
requires a timely objection to the admission of evidence stating the specific ground of the objection if a specific ground is not apparent from the context within which the question was asked. The reason for the requirement of specificity is to permit both court and counsel to better deal with the objection, either by way of counsel's correction of the claimed error, or as assistance to the court for a fair and more accurate ruling.

*Langenheim v. City of Seward*, 200 Neb. 740, 745, 265 N.W.2d 446, 450 (1978).

In *Havlicek v. State*, 101 Neb. 782, 784-85, 165 N.W. 251, 251-52 (1917), we stated:

It is the duty of counsel to make his objections so specific that the court may understand the point intended to be raised . . . .

"Unless the objection to offered evidence be sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objection and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom in the court of appeal."

The relevancy objections made by defense counsel were not adequate to raise a question of improper impeachment. The trial court had no opportunity to rule on such an issue, and, thus, the alleged error was not properly preserved for an appeal. "Questions not presented to or passed upon by the trial court will not be considered on appeal." *Schwaninger v. Schwaninger*, 192 Neb. 681, 687, 223 N.W.2d 829, 833 (1974).

From our examination of the record we have concluded there was no error prejudicial to the defendant committed by the trial court during the examination of Merryman.

The final assignment of error relates to the State's granting of use immunity to the witness Russell Kreinbrook, pursuant to Neb. Rev. Stat. § 29-2011.02 (Reissue 1985).

About 4 to 5 days after the robbery, the defendant asked Kreinbrook to store a 9-millimeter handgun for the defendant. Apparently, it was the weapon used in the robbery. Kreinbrook put the gun, inside a gray toolbox, under his bed. He was

eventually contacted by the police, at which time he turned the box over to them. He did not inform them at this time that a gun was inside the box because Kreinbrook himself was a convicted felon and was aware that it was illegal for him to possess a handgun. Since Kreinbrook was the only individual who could connect the gun used in the robbery to the defendant, his testimony was of importance to the State.

The defendant contends that although the State characterizes the immunity given Kreinbrook as use immunity, Kreinbrook was actually given total and absolute immunity from prosecution and as a result the jury was misled, which violated the defendant's due process rights to a fair trial.

The defendant claims that because Kreinbrook testified without immunity at the preliminary hearing, at that time admitted to being a felon in possession of a firearm, and yet no charges were filed against him after that testimony, in fact Kreinbrook was testifying at trial under a grant of transactional and not use immunity. We do not agree.

The jury was fully apprised of the nature and effect of the immunity granted to Kreinbrook through the following dialogue:

Q. Mr. Kreinbrook, is it correct that at the present time you have been — your testimony — the state has agreed that your testimony, that is, *what you are saying here in court today*, cannot be used against you in any subsequent criminal prosecution accept [sic] for perjury, lying under oath. Do you understand that to be the circumstance?

A. Yes.

Q. You do realize you could be prosecuted for perjury?

A. Yes.

Q. And you also realize that *you could be prosecuted for being a felon in possession of a firearm it's just that the state couldn't use your testimony that you give here today in court against you*. Do you realize that?

A. No.

Q. Do you think you could be prosecuted for being a felon in possession of a firearm if we did not use your testimony against you?

A. I don't understand.

MR. SHARP: May we approach, Your Honor?

THE COURT: You may.

. . . .

Q. (BY MR. SHARP) Mr. Kreinbrook, I want to try to make this clear for the record. *You can still be prosecuted for being a felon in possession of a firearm.* Do you understand that?

A. Yes.

Q. *The testimony that you are giving here today, however, could not be used in that prosecution.* Do you understand that?

A. Yes.

Q. If you lied under oath, you could be prosecuted for perjury, do you understand that?

A. Yes.

. . . .

Q. [By Mr. Soucie] Mr. Kreinbrook, *have you been charged with being a felon in possession of a firearm*?

A. No.

Q. Has anyone associated with the prosecution, either law enforcement officers or prosecuting attorneys, discussed with you whether you are going to be prosecuted for being a felon in possession of a firearm?

A. No.

Q. Did you ever discuss that with any prosecutors?

A. No.

Q. Did you ever discuss it with any prosecutors, immunity?

A. Yes.

Q. When did you discuss with them immunity?

A. This morning.

Q. What type of discussions did you have with them?

A. Just what was going to go on in here today.

Q. What kind of immunity did you ask for?

A. I didn't ask.

Q. Did you mention the word immunity?

A. No.

Q. What did you ask for?

A. I didn't ask for nothing.

Q. Maybe I misunderstood your question — or your answer. Did you have some discussions with prosecutors this morning regarding immunity?

A. Yes.

Q. Just tell me in your own words what the discussion was?

A. He told me that he would try to use some type of immunity for me to sit up here today.

Q. And what was your understanding as to what that immunity would involve?

A. That if —

Q. What were you going to get?

A. *That I wouldn't be prosecuted for what was said today.*

Q. And what do you understand that to mean, that you wouldn't be prosecuted for what you say today?

A. Yes.

Q. What does that mean to you?

A. That *no charges on what was going on in here today would be brought up against me.*

Q. What is your understanding regarding whether you will be charged or could be charged with being a felon in possession of a firearm tomorrow or sometime in the future?

A. I don't know.

Q. Do you think that you are not going to be charged or that you will be charged or you can be charged? What's your understanding?

A. *I understood I could be charged.*

Q. You are not going to be charge [sic]?

A. *I could be charged.*

Q. You could be charged but your understanding at the present time you have not been charged, is that right?

A. Yes.

(Emphasis supplied.)

The witness was extensively examined and cross-examined on the issue of immunity. There were no ambiguities from which the jury could be misled concerning the extent of the immunity granted.

The fact that Kreinbrook has not been prosecuted as a result of testimony elicited at the preliminary hearing does not foreclose the possibility that such a prosecution might take place. That fact is not determinative of the extent of immunity actually granted. We find this assignment meritless.

The judgment is affirmed.

AFFIRMED.

HASTINGS, C.J., participating on briefs.