STATE OF NEBRASKA, APPELLEE, V.
TIMOTHY F. TOLLIVER, APPELLANT.
689 N.W.2d 567

Filed December 10, 2004.    No. S-03-1300.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Timothy F. Tolliver appeals from his conviction for manslaughter. He was sentenced to 16 to 20 years' imprisonment.

## SCOPE OF REVIEW

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004).

■ A trial court's determination of the admissibility of physical evidence will not ordinarily be overturned except for an abuse of discretion. *State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002).

## FACTS

In the early morning hours of June 9, 2002, the body of Richard Edward Rice, Jr., was discovered in an Omaha park. An autopsy revealed that Rice had died as a result of manual strangulation.

At the time of his death, Rice was employed as a driver for an unlicensed taxi service. Rice drove a white Oldsmobile, and his logbook revealed that he went out on two calls on the evening of June 8, 2002, before midnight.

At approximately 11:50 p.m. that evening, police were called to the home of Monica Davis to investigate damage to the front quarter panel of her black Ford Bronco. Police observed white paint transfer on the Bronco, and a piece of tail light from an Oldsmobile was found near the Bronco. Davis had heard a noise outside her home around 11 p.m. and had observed a white vehicle in a driveway across the street.

Davis' mother, Angie Cutler, had been involved romantically with Tolliver. On the evening of June 8, 2002, Tolliver telephoned Angie Cutler and asked for money and a ride to the bus station. She refused, Tolliver became angry, and they argued. At approximately 10:30 p.m., Angie Cutler heard a loud crash outside her home. The next morning, she observed that her garage door had been damaged.

Around 2 a.m. on June 9, 2002, Letitia Cutler, a niece of Angie Cutler, was standing across the street from Letitia Cutler's residence. She was talking to her cousin and another acquaintance. Letitia Cutler saw a white four-door car arrive in front of her cousin's house. A bald black male exited the vehicle and walked up the driveway where they were standing. The man was there for about 15 minutes, and Letitia Cutler heard him speak to her cousin. When police arrived at the scene, the man had run away.

At approximately 3 a.m., an Omaha Police Department (OPD) officer responded to a call about a disturbance near the area of Letitia Cutler's residence. Upon her arrival, the officer discovered an unoccupied white Oldsmobile with its engine running. The rear of the vehicle was damaged, and one of its tail lights was missing. The car was later found to belong to Rice.

Sometime after June 9, 2002, police officers went to Letitia Cutler's house and wanted to talk to her brother. She told them that her brother did not know anything about the incident involving the white Oldsmobile but that she did. For some reason, the officers did not question her. After the discovery of Rice's body, several articles appeared in the Omaha World-Herald newspaper. Letitia Cutler had seen one of the articles that mentioned Tolliver and her aunt.

Det. Ken Kanger subsequently interviewed Letitia Cutler. The detective stated that the police had the man responsible in jail and that they were trying to "shore up" some information. He told her that an elderly man had been killed and that the police would like to do what they could to make sure that person did not do it again.

Letitia Cutler told Kanger that she saw a white car pull up in the early morning hours of June 9, 2002, and that a black man got out of the car. She described him as bald and wearing a T-shirt. Letitia Cutler was then asked to look at a photographic array, and Kanger read her written admonishments located on the photographic array form.

Letitia Cutler viewed the photographic array, which consisted of six photographs of black males with some facial hair and either little or no hair on their heads. She selected the photograph of Tolliver and said that he looked like the man who had exited the white car and stood next to her for approximately 15 minutes in the early morning hours of June 9, 2002. She told Kanger that the man she identified had previously dated her aunt, Angie Cutler, and that she had seen him once before June 9 at a casino. She stated that she had not immediately recognized Tolliver that night because he did not look the same.

Later, the police searched the site of a company where Tolliver had recently been employed as a truckdriver. The search produced a pair of tennis shoes belonging to Tolliver. The shoes were taken into police custody and later sent to the University of Nebraska Medical Center's human DNA identification laboratory (DNA lab) for testing. Tolliver was subsequently arrested and charged with first degree murder.

Prior to trial, Tolliver filed a motion in limine requesting that the district court preclude the use of any testimony concerning

the DNA testing and its results. Following a hearing, the court concluded that the State's witnesses were qualified as experts and could testify regarding the DNA issues. It found that based upon the evidence received at the hearing, the theory and methodology of the DNA testing and the technique had been generally accepted by the scientific community. The court concluded that the methodology utilized for the DNA testing was reliable. It overruled Tolliver's motion in limine and allowed the State to introduce testimony concerning the DNA testing and the results of those tests.

Tolliver also moved to suppress Letitia Cutler's identification. He claimed the photographic array was unduly suggestive and was not reliable based upon the totality of the circumstances. The district court concluded that the procedure utilized for the photographic identification by Letitia Cutler was not unduly suggestive or conducive to a substantial likelihood of irreparable mistaken identification. It overruled Tolliver's motion to suppress the witness' identification.

The jury convicted Tolliver of manslaughter, and he was sentenced to 16 to 20 years in prison. He timely appealed.

## ASSIGNMENTS OF ERROR

Tolliver assigns that the district court erred in (1) allowing the State to present evidence derived from certain DNA tests, because the State failed to satisfy the reliability standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); (2) allowing the State to present evidence concerning the DNA taken from a pair of tennis shoes, because there was a break in the chain of custody necessary to preserve the integrity of the evidence; and (3) failing to sustain his motion to suppress the testimony of Letitia Cutler, because the identification procedures used by OPD to obtain her testimony were unduly suggestive and a violation of due process.

## ANALYSIS

Tolliver claims that the district court erred in allowing the State to present expert testimony that did not comport with the *Daubert* standard for admissibility. He argues that the State failed to sustain its burden of proof with regard to the reliability of the methodology of the DNA testing that was used on samples taken from

Tolliver's tennis shoes. In particular, he challenges the reliability of the DNA lab's characterization of a mixed sample of DNA and its designation of the major and minor contributors to the sample being tested.

A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.*

Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995), governs the admissibility of expert testimony. Under rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Whether a witness is qualified as an expert is a preliminary question for the trial court. *Carlson v. Okerstrom, supra.* A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. *Id.*

The validity of the DNA testing was described by the State's expert witnesses. In its evaluation of the admissibility of the evidence regarding the DNA testing, the district court first determined that the State's witnesses were qualified as experts by their knowledge, skill, experience, training, and education. The DNA lab was supervised by James Wisecarver and Ron Rubocki. Wisecarver has a Ph.D. in physiology and is a licensed doctor of medicine. Rubocki has a Ph.D. in microbiology. The testing was done by Kelly Duffy and Mellissa Helligso, who are both certified medical technologists. The court did not err in permitting the State's witnesses to testify as experts.

By deposition, Wisecarver explained the theory and methodology underlying the DNA testing. Wisecarver and Rubocki testified regarding written protocols that were utilized by the DNA

lab during the testing of the samples in question. Duffy explained her testing of certain samples and stated that she followed the DNA lab's protocol with only minor deviations that did not affect the results.

The State's experts gave a general description of the DNA testing utilized in this case. Polymerase chain reaction (PCR) amplification was used to amplify a targeted loci of the sample of DNA by replicating the process by which DNA duplicates itself naturally. The DNA lab was then able to produce a substantial number of specific targeted segments of DNA which could be typed and compared. Short tandem repeat (STR) analysis was used to type and compare the DNA. Statistics were then used to evaluate how likely it was that a similar match would occur if the DNA samples were drawn randomly from the population.

Wisecarver also discussed the issue of mixed samples with the PCR-STR technique. A mixed sample is one which contains DNA from two or more individuals. He described the means by which the DNA lab separated such a sample into major and minor contributors. He stated that this technique was widely accepted among forensic scientists and in courts throughout the country and that it was utilized in Federal Bureau of Investigation laboratories and the Armed Forces Institute of Pathology. He also testified as to the extremely low known rate of error associated with this test.

Wisecarver discussed the DNA lab's accreditation and stated that it was inspected by the American Society of Crime Laboratory Directors (ASCLD) and had received a certificate of accreditation. ASCLD is a national accreditation source for forensic DNA laboratories and is referenced by the Legislature in Neb. Rev. Stat. § 29-4120(6) (Cum. Supp. 2002). Through ASCLD, the DNA lab participated in proficiency tests and a review of its protocols in order to examine its quality control and accuracy in its procedures. The evidence established that the DNA lab regularly maintained and updated its written protocols.

Rubocki testified that he was an assistant professor in the Department of Pathology and Microbiology at the University of Nebraska Medical Center and the technical director of the DNA lab. He discussed the procedures used by the DNA lab for identification in mixed samples and opined that the procedure was

based upon recognized scientific principles that had been tested and accepted in the scientific community.

Rubocki stated that the equipment utilized was working properly, the technicians followed the protocols, and the results of the testing were accurate. He stated that there were no deviations from the protocol of any significance on the results and that any deviations that occurred were minor. Rubocki further testified that the general genetic principles utilized are all accepted by the scientific community.

Duffy testified that she was one of two laboratory technicians who conducted the PCR-STR tests performed on the samples taken from Tolliver's shoes. She explained the particulars of the technique in general, the ASCLD accreditation, and the proficiency tests in which the DNA lab participated. Both Wisecarver and Rubocki signed off on her report concerning the results of the test.

In this case, some of the DNA tests involved specimens from the victim, Tolliver, and another suspect, which specimens were analyzed by PCR amplification. Small droplets on Tolliver's tennis shoes that appeared to be blood were also tested. Based on the testing, the victim's DNA was not excluded as the major contributor of blood found on the tennis shoes belonging to Tolliver, and the probability of an unrelated individual matching the major DNA profile from the blood on the tennis shoes was 1 in 1 quintillion for African Americans and 1 in 1 sextillion for Caucasians and American Hispanics.

■ A trial court's evaluation of the admissibility of expert opinion testimony is essentially a four-step process. The court must first determine whether the witness is qualified to testify as an expert. It must examine whether the witness is qualified as an expert by his or her knowledge, skill, experience, training, and education. If it is necessary for the court to conduct a *Daubert* analysis, then the court must determine whether the reasoning or methodology underlying the expert testimony is scientifically valid and reliable. To aid the court in its evaluation, the judge may consider several factors, including but not limited to whether the reasoning or methodology has been tested and has general acceptance within the relevant scientific community. Once the reasoning or methodology has been found to be reliable, the court

must determine whether the methodology can properly be applied to the facts in issue. In making this determination, the court may examine the evidence to determine whether the methodology was properly applied and whether the protocols were followed to ensure that the tests were performed properly. Finally, the court determines whether the expert evidence and the opinions related thereto are more probative than prejudicial, as required under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995).

We recently discussed our standard for the admissibility of expert testimony in *Carlson v. Okerstrom*, 267 Neb. 397, 410, 675 N.W.2d 89, 103 (2004): "Under rule 702, it is not enough that a witness is qualified as an expert. The trial court must also act as a gatekeeper to ensure the evidentiary relevance and reliability of the expert's opinion." In *Schafersman v. Agland Coop*, 262 Neb. 215, 232, 631 N.W.2d 862, 876-77 (2001), we stated:

[I]n those limited situations in which a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, pursuant to [rule] 702, whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.

In *Carlson*, we noted that Fed. R. Evid. 702 had been amended in 2000 in order to codify *Daubert*. In doing so, "[t]he revised rule explicitly requires courts to determine if '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" (Emphasis omitted.) *Carlson v. Okerstrom*, 267 Neb. at 413, 675 N.W.2d at 104-05.

Based upon the evidence offered by the State, the district court concluded that the theory and methodology of PCR-STR DNA testing had been generally accepted by the scientific community. The court also found that the theory and methodology had been subjected to peer review and that standards existed and

were maintained for controlling the techniques, operation, and known rates of error.

In *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317 (1998), we concluded that the trial court was correct in determining that the PCR-STR DNA test used was generally accepted in the scientific community under the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). More recently, in *State v. Fernando-Granados, ante* p. 290, 682 N.W.2d 266 (2004), we also recognized the validity of the PCR-STR method of testing.

Nebraska's DNA Testing Act is codified at Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Cum. Supp. 2002 & Supp. 2003). When § 29-4118(3) was enacted, effective September 1, 2001, the Legislature stated that

> new forensic DNA testing procedures, such as polymerase chain reaction amplification, DNA short tandem repeat analysis, and mitochondrial DNA analysis, make it possible to obtain results from minute samples that previously could not be tested and to obtain more informative and accurate results than earlier forms of forensic DNA testing could produce.

Thus, the Legislature has also recognized the reliability of PCR-STR DNA testing and its acceptance within the scientific community.

A trial court's determination of the admissibility of physical evidence will not ordinarily be overturned except for an abuse of discretion. *State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002). The testimony from the *Daubert* hearing established that the PCR-STR technique had been tested and subjected to peer review. The witnesses described the protocols that were maintained to control the techniques. These protocols had been presented with approval to ASCLD, a national accreditation body for forensic DNA laboratories. Evidence was also presented with regard to the known rate of error of the techniques.

The district court determined that the application of the technology and the conduct of the tests established that the technology was properly applied and that the experts followed the protocols in place to ensure the tests were performed properly. It noted that the challenges made by Tolliver were relevant to the weight of the evidence rather than to its admissibility. It found

that the methodology was reliable and that the existence of a subjective element in the identification of the major and minor contributors to the DNA examined did not render the opinions inadmissible.

We conclude that the district court did not abuse its discretion in admitting this evidence, and Tolliver's first assignment of error is without merit.

Tolliver next argues that the district court erred in admitting the results of the DNA tests because there was a break in the chain of custody with respect to the tennis shoes from which the DNA samples were taken. Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence. *State v. Bobo*, 198 Neb. 551, 253 N.W.2d 857 (1977). It is elementary that objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue. *Id.* Our review concerning the admissibility of this evidence is for abuse of discretion. See *State v. Mather, supra.*

Officer Daniel Hayes of OPD testified that he collected the tennis shoes from Tolliver's truck on June 13, 2002. They were placed in separate bags and sealed with adhesive tape. Karenina Smith testified that she worked in the OPD crime laboratory and received the tennis shoes on the evening of June 13. The bags were placed in the property room, and she could not remember how they were packaged.

Paul Merkuris testified that he worked in the OPD property room and that he retrieved the bags on the morning of June 14, 2002. They were handed over to Officer Catherine Milone. Merkuris believed the bags were taped shut at that point. Milone testified that she retrieved the bags and took them to the DNA lab. She could not recall how the evidence was packaged.

Duffy testified that she received the bags at the DNA lab and noted in her report that the bags were not sealed. She also testified that the DNA lab does not consider certain types of adhesive tape to be a "proper seal." Accordingly, in such situations, the DNA lab will use its own evidence tape to seal an item and ensure

that the item is not tampered with while in the DNA lab's custody. Duffy stated that she sealed the bags with the DNA lab's tape after processing the shoes for testing.

It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading. See *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992). Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object. See *State v. Apker*, 204 Neb. 577, 284 N.W.2d 14 (1979). Tolliver argues that the fact that Duffy noted that the bags were not sealed constitutes undisputed evidence of tampering with the evidence. We disagree.

Whether there is sufficient foundation evidence for the admission of physical evidence must necessarily be determined on a case-by-case basis. *State v. Smith*, 238 Neb. 111, 469 N.W.2d 146 (1991). In *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998), we held that proof that an exhibit remained in the custody of law enforcement officials is sufficient to prove a chain of possession and is sufficient foundation to permit its introduction into evidence.

Evidence established that the tennis shoes were in the custody of law enforcement officials from the time they were placed in the bags and sealed with adhesive tape until they were delivered to the DNA lab. Tolliver has not established that anyone tampered with the shoes. Tolliver does not argue that tampering occurred after the shoes were delivered to the DNA lab. He unsuccessfully attempts to infer that the sacks containing the shoes were not sealed. Since a continuous chain of custody was established with law enforcement officials which clearly identified the evidence, we cannot say that the district court abused its discretion in allowing the evidence to be introduced. Tolliver's second assignment of error lacks merit.

Tolliver assigns as error the district court's failure to sustain his motion to suppress the testimony of Letitia Cutler, claiming that the identification procedures were unduly suggestive and violated due process. From a photographic array, Letitia Cutler identified Tolliver as the man she witnessed arriving in a white vehicle in the early morning hours of June 9, 2002. Tolliver

moved to suppress and exclude her testimony, claiming that her identification was the result of a photographic lineup conducted by police that denied him due process. He argued that the lineup was unduly suggestive, the actions of the police prior to and during the lineup were unduly suggestive, and Letitia Cutler's identification of Tolliver was not the result of her actual observations. He contended that there was a substantial likelihood of irrefutable misidentification of him as the individual who arrived in the white car. The court overruled this motion.

In determining whether the findings of fact on a motion to suppress evidence are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. See *State v. Peters*, 261 Neb. 416, 622 N.W.2d 918 (2001). An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. *State v. Garcia*, 235 Neb. 53, 453 N.W.2d 469 (1990). Whether identification procedures were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of the totality of the circumstances surrounding the procedures. *State v. Gibbs*, 238 Neb. 268, 470 N.W.2d 558 (1991).

The initial inquiry is whether the identification procedure was suggestive. See *State v. Garcia, supra.* Tolliver argues that the statements made to Letitia Cutler by Kanger during the photographic lineup on July 17, 2002, were unduly suggestive. Prior to the lineup, Kanger told Letitia Cutler that an elderly gentleman had been killed and that the police would like to do what they could to make sure the perpetrator did not kill again. Kanger stated that the police had the person responsible in jail and that they were trying to shore up some information they had. After showing her six photographs, Kanger told her that the police wanted to "make sure this clown doesn't get out of jail." Tolliver contends that these statements were an attempt to influence Letitia Cutler by playing on her emotions and suggesting that her failure to identify the right person would result in the culprit's being released.

A statement made by a police officer at a photographic lineup indicating that the array of photographs contains the suspect's picture does not render the identification procedure unduly suggestive. See, *State v. Garcia, supra*; *State v. Joseph*, 202 Neb. 268, 274 N.W.2d 880 (1979). Kanger's statements did not tell Letitia Cutler whom to pick from the lineup. Even if the statements had an emotional appeal, they did not guide her toward picking one photograph or another. The photographic array consisted of six photographs of black males with some facial hair and either little or no hair on their heads. In making an assessment of whether the procedures were unduly suggestive, a court can consider such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness, and the length of time between the crime and the identification. See *State v. Wilson*, 5 Neb. App. 125, 556 N.W.2d 643 (1996). The same factors can be considered in determining the reliability of a witness.

Tolliver next argues that the identification was not reliable because Letitia Cutler's attention was not focused on the individual on the night in question. He contends that she may have seen a photograph of Tolliver in the newspaper and that her description was minimal, her level of certainty was questionable, and her identification was made 6 weeks after the incident.

Letitia Cutler stated that she watched the individual leave the vehicle and that he stood next to her for approximately 15 minutes. During that time, she heard him speak. She had ample opportunity to make her observation, and there is no evidence that any lapse in her attention span would have resulted in an unreliable observation. Her initial description was that of a bald black male. While this description is minimal, it fits the description of Tolliver.

At the photographic lineup, Letitia Cutler selected the photograph of Tolliver and stated that he looked like the individual she had observed. Tolliver claims that this did not constitute a positive identification and that Letitia Cutler should have been familiar with him because he was her aunt's ex-boyfriend. We disagree.

Tolliver also argues that too much time elapsed between Letitia Cutler's observation and the lineup. Her observation was made on June 9, 2002, and the lineup occurred nearly 6 weeks later on July 17. We have concluded that longer stretches of time are reasonable. See, *State v. Sanders*, 235 Neb. 183, 455 N.W.2d 108 (1990) (2 months); *State v. Richard*, 228 Neb. 872, 424 N.W.2d 859 (1988) (2 months); *State v. Packett*, 207 Neb. 202, 297 N.W.2d 762 (1980) (2½ months). In addition, there was no evidence presented which would show that the passage of time adversely affected Letitia Cutler's ability to make an identification.

Tolliver also asserts that Letitia Cutler may have viewed his photograph prior to the lineup in a newspaper article that she admitted to having seen. He claims this was an improper basis for her identification. As noted, Letitia Cutler had an independent basis for her identification of Tolliver—the 15 minutes she stood next to him after he exited the vehicle on June 9, 2002. The extent to which external sources have influenced an identification is a matter for the trier of fact. See *Robinson v. Wyrick*, 735 F.2d 1091 (8th Cir. 1984). We conclude from the totality of the circumstances that the district court correctly found that the identification process did not violate Tolliver's right to due process. Tolliver's final assignment of error is without merit.

## CONCLUSION
For the reasons stated herein, we affirm the judgment and sentence of the district court.

AFFIRMED.