IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. TACKETT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JEREMY D. TACKETT, APPELLANT.

Filed October 30, 2018.    No. A-17-1247.

Appeal from the District Court for Saunders County: MARY C. GILBRIDE, Judge. Affirmed.

Mark A. Steele, of Steele Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a bench trial in the district court for Saunders County, Jeremy D. Tackett, also known as James M. Tackett, was convicted of third degree assault on an officer, obstructing a police officer, resisting arrest, and two counts of false reporting. The district court ordered concurrent sentences of 1 year of imprisonment in county jail for each conviction, followed by 12 months of postrelease supervision. On appeal, Tackett challenges the district court's decision to partially sustain a motion to quash a "Deposition Notice Duces Tecum," which sought certain personnel records of the deputy with whom Tackett interacted. Tackett also challenges the admission of certain exhibits, the sufficiency of the evidence, the sentences imposed, and the effectiveness of his trial counsel. We affirm.

- 1 -

## II. BACKGROUND

### 1. INITIAL ENCOUNTER AT BOMGAARS

Ken Jackson, Chief of Police at the Wahoo Police Department, testified that on October 18, 2016, he received a dispatch at 3 p.m. to go to the "Bomgaars" store in Wahoo, Nebraska, "in reference to some individuals that they had been watching for and they said they were at the store." Chief Jackson approached "a white Chevrolet with no plates and in-transits, which is what [he] went there to see." According to Chief Jackson, he initially spoke with Steven Boltz, who was in the vehicle. Boltz produced his driver's license; there was also a female in the car who was later identified as Cheyenne Fox. Chief Jackson instructed Boltz to stay there, and Chief Jackson then entered the store and asked the clerks "where the person was that they'd been watching." He went to look for the other individual, and when he returned to the front of the store, a clerk told him that the other individual had gone out the door. Chief Jackson went outside and found the third individual seated inside the white Chevrolet, and when he asked for identification, the person "had none." The third individual identified himself as Jeremy Tackett born in 1983, but Chief Jackson later discovered Tackett's name was James Tackett and his birth year was 1980.

Chief Jackson informed Boltz he was under arrest for an outstanding warrant and that his vehicle would be impounded pending proof of ownership and insurance. Chief Jackson said the other two individuals were released because "[i]t was determined that we did not have enough to show that there had been any theft taken [sic] place on this date." According to Chief Jackson, two deputies from the sheriff's office had arrived on scene and offered to start the inventory of Boltz' vehicle. During the inventory search, "new property," which "still had tags on it," was found within the vehicle. This caused Chief Jackson to want to detain Tackett and Fox for further questioning, so he issued a statement to other officers to detain Tackett and Fox if they were found. Fox was located shortly thereafter, but Tackett was not located "until much later."

### 2. INCIDENT LATER THAT NIGHT

A witness, who lived a couple miles south and east of Bomgaars, testified that at around 8 p.m. that same night, a man, later identified as Tackett, "knocked on our door." He was "there standing with no shirt on and [was] kind of disheveled or messy." According to this witness (the resident), Tackett told him that his girlfriend had kicked him out of the car, and he wanted to charge his cell phone to ask someone to pick him up. The resident provided Tackett with a USB port and told him he could charge the cell phone on the front porch; the resident also provided Tackett with a sweatshirt to wear. The resident decided to call "911" because he thought the situation was "a little odd."

Brandon Stenger, who at the time was a deputy with the Saunders County Sherriff's Department, testified that he was on duty that night and responded to a dispatch call directing him to the resident's address. Deputy Stenger was informed that a suspicious male was on the porch at the residence and that there was probable cause to arrest the male. When he arrived at the residence, Deputy Stenger saw Tackett sitting in the corner of the porch; he thought Tackett appeared shocked to see him. Tackett testified that he explained to Deputy Stenger that he was just charging his cell phone and the resident knew he was there. Tackett identified himself as Jason Allen, born in

October 1982. Based on his prior law enforcement experience, Deputy Stenger believed he had been given a false identification.

Deputy Stenger testified that after the identification discussion, he believed he "asked [Tackett] for [a] pat search for weapons, which [Tackett] freely gave." Tackett testified that he had a lighter in his sock. Deputy Stenger testified that he found the lighter and Tackett's cell phone during the pat-down search. Deputy Stenger said that he gave the lighter back to Tackett, something Tackett denied.

Deputy Stenger directed Tackett to sit in the back of his patrol vehicle while he ran an identification check, but Tackett would not cooperate. Deputy Stenger acknowledged that he had not placed Tackett under arrest at that time, and when asked whether he told Tackett he was not free to leave, Deputy Stenger replied, "The conversation happened so quick, I don't believe we were able to get to that." Deputy Stenger told Tackett that he believed Tackett "was the individual that was involved at Bomgaars" and that he was "wanted from the Bomgaars incident." Deputy Stenger said that Tackett's demeanor changed and he became erratic and took off running. However, Tackett testified that he asked whether he was under arrest at this point and that Deputy Stenger had replied that he was not. Tackett said he did not want to get in the car because he was "not feeling good," but he agreed to talk with Deputy Stenger. Tackett said Deputy Stenger was holding him by the sleeve of "the hoodie that the owner had given [him]," and Tackett "made the decision that [he] was going to leave the area." According to Tackett, he then "reached down with both hands" and "pulled the hoodie up over [his] head." Deputy Stenger said that Tackett took off running across the road, through a ditch, then fell; Deputy Stenger ordered Tackett to stop. Tackett testified that Deputy Stenger could not get ahold of him during the chase because Tackett was shirtless and was "basically able to squirm out of [the deputy's] grip and run away."

According to Deputy Stenger, he eventually reached Tackett and tried to get on top of him to restrain him. Deputy Stenger characterized this part of the incident as a "ground fight," saying Tackett continued to "struggle and fight with me." However, Deputy Stenger admitted that he did not recall Tackett ever punching, hitting, kicking, kneeing, head-butting, or threatening him. After the resident observed what he described as a "struggle on the ground," he said he called 911 again.

Deputy Stenger said that Tackett was able to get off the ground at some point, and Deputy Stenger was behind him. Deputy Stenger put his arms around Tackett in a "bear hug," which the deputy claimed was an effort to restrain Tackett. Deputy Stenger testified that as the struggle continued, he felt a tug at his belt around the gun area and a sharp pain in his left hand so he tried to take Tackett to the ground. He said, "When we went down to the ground, that's when I saw a lighter pop out and I looked at my hand and saw a burn mark." Deputy Stenger was able to get Tackett's hands behind his back, but while trying to retrieve handcuffs, "all of a sudden, the fight was back on." They were struggling on the ground, and at one point while "face to face," Deputy Stenger felt another tug to his belt and thought Tackett was going for his gun again, so he "disengaged to avoid a deadly situation." Deputy Stenger said that Tackett ran away again despite his order to stop.

According to Tackett, he never wrestled with nor tried to grab ahold of Deputy Stenger; rather, Tackett claimed he was just trying to pull away. Tackett did admit to giving a false name and to resisting the deputy, but he testified that he did not have a lighter after he gave it to the deputy on the porch. Tackett said he ran "quite a ways" and up over a hill in a field, and "[a]t some

point [he] felt like [he] was having a heart condition," and his legs gave out. He fell down, but got back up and tried to run some more, but could not, so he "laid there," thinking that if he wasn't seen, "they'd go back."

Deputy Stenger said he tried to run after Tackett, but he had to walk because he experienced shortness of breath and chest pains. The resident saw the deputy in pursuit of Tackett and it did not appear that the deputy would catch up to Tackett, so the resident picked the deputy up in his "SUV" and proceeded up a hill. When they caught up with Tackett, Deputy Stenger exited the vehicle and handcuffed Tackett. Tackett said that he told Deputy Stenger he was experiencing heart complications, so Deputy Stenger called an ambulance for Tackett. The Chief Deputy for the Saunders County Sheriff's Office, Steven Malina, rode with Tackett in the ambulance to the hospital. Deputy Malina testified that Tackett was "free to leave" when he was being transported, and that Tackett was not arrested that day.

After Deputy Stenger gave custody of Tackett to another officer, he walked to the bottom of the hill to pick up his body camera which had fallen off, and to get "the evidence that was where we rolled around on the ground." He explained that the "evidence" was the lighter and the cell phone. According to Deputy Stenger, he gave Deputy Malina the black lighter out in the field. However, Deputy Malina testified that Deputy Stenger handed him the lighter at the hospital, although he was "not 100 percent certain."

Deputy Stenger said he drove his patrol vehicle to the Saunders County Medical Center, thinking he might be having a cardiac issue. He claimed he felt pain in his chest and left hand while in the hospital, had bruising on the top of his left hand, a burn on the palm of his left hand and a blister had developed on his hand. He was given a "brace splint" to protect his hand. Deputy Malina went to see Deputy Stenger at the hospital, where he observed a mark on Deputy Stenger's left palm so he took some photographs. Deputy Malina believed it looked like a blister.

### 3. VERDICTS

A bench trial was held August 18, 2017; the evidence adduced is set forth in significant part above, and will be supplemented as necessary in our analysis of the assigned errors. On September 11, the district court sustained the State's motion to dismiss the charges of attempted use of a deadly weapon to commit a felony and possession of methamphetamine, and entered its "Verdict." "Verdict[s] Nunc Pro Tunc" were entered on September 11 and 12. The district court found Tackett guilty of third degree assault on an officer, obstructing a police officer, resisting arrest, and two counts of false reporting. The court found Tackett not guilty of second degree assault on an officer and dismissed that charge. The court ordered a presentence investigation and restitution analysis.

After a sentencing hearing on November 6, 2017, the district court ordered concurrent sentences of one year of imprisonment in the Saunders County Jail for each conviction, followed by 12 months of postrelease supervision. The court credited Tackett with 383 days of time served. The record reflects that Tackett was released from jail that same day.

Tackett appeals.

- 4 -

## III. ASSIGNMENTS OF ERROR

Tackett assigns, consolidated, restated, and reordered, that the district court erred in (1) partially sustaining the State's second motion to quash a deposition notice duces tecum seeking personnel records for Deputy Stenger; (2) admitting exhibits 4, 5, 9, and 10 into evidence; (3) finding sufficient evidence for the convictions of third degree assault on an officer and resisting arrest; and (4) imposing an excessive sentence. Tackett also claims that his trial counsel provided ineffective assistance in defending him.

## IV. STANDARD OF REVIEW

Decisions regarding discovery are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion. *Breci v. St. Paul Mercury Ins. Co.*, 288 Neb. 626, 849 N.W.2d 523 (2014).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Trice*, 292 Neb. 482, 874 N.W.2d 286 (2016). An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result. *Id.*

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *State v. Sidzyik*, 281 Neb. 305, 795 N.W.2d 281 (2011). The determining factor is whether the record is sufficient to adequately review the question. *Id.*

## V. ANALYSIS

### 1. STATE'S SECOND MOTION TO QUASH

Tackett filed a motion for depositions of all the State's witnesses, which the district court subsequently sustained. The State filed an initial motion to quash the deposition of Deputy Stenger, which the district court overruled. The State filed a second motion to quash a portion of the "Deposition Notice Duces Tecum" sent to Sheriff Kevin Stukenholtz, Deputy Stenger's former supervisor. Although a copy of Tackett's deposition notice is not in the record before us, the State's motion to quash states, in relevant part:

> Request 7 commands Sheriff Stukenholtz to bring "All documents in the administration and personnel files reference [sic] Deputy Stenger, including but not limited

to complaints, write-ups, discipline, termination, suspension, injury, sick leave or worker's compensation claims or reports made or recorded on or after October 1, 2016."

The request is outside the scope of the triable issues, and is an impermissible fishing expedition designed to tarnish the reputation of former Deputy Stenger without justification or cause.

At the hearing on the State's motion to quash, the State noted there was no problem with providing information related to Deputy Stenger's "injury, sick leave or workers' comp claims or reports." However, it argued that any "complaints, write-ups, discipline, termination, [or] suspension have absolutely nothing to do with this case," and that this was a "fishing expedition with the intent to tarnish the reputation of former [D]eputy Stenger." However, Tackett argued that Deputy Stenger "is the primary witness against [Tackett] in the case." Tackett noted that he learned Deputy Stenger was no longer employed by the Saunders County Sheriff, and "that raises the question in any mind as to why and whether or not that has any relevance to this particular case." Tackett claimed Deputy Stenger "falsified or lied" at a preliminary hearing about his hand being broken "even though he was specifically told by doctors that his hand was not . . . broken at all." Tackett argued that Deputy Stenger's credibility "is a major factor," and Tackett should be able to review "if [Deputy Stenger] has been disciplined, wrote [sic] up, [or] suspended for any misconduct that could affect his credibility in this case." The State responded it was "under a duty to disclose anything that reflects on the credibility of an officer," and it had "no information that Deputy Stenger has anything related or anything that impugns his credibility or [it] would turn that over."

The district court entered an order partially sustaining the State's second motion to quash as to the requests for "complaints, write-ups, discipline, termination, suspension," but otherwise overruling the motion "in all other respects." The court provided no explanation for its decision.

Tackett asserts on appeal that "the requested records were directly relevant to the credibility of [Deputy] Stenger, and may have provided information attacking the reliability of his testimony." Brief for appellant at 13. He claims the requested information "is not potentially privileged nor has privilege been asserted by any party." *Id*. at 14. The State disagrees, noting that Neb. Rev. Stat. § 84-712.05(7) (Cum. Supp. 2016) provides that personnel records of public bodies may be withheld from public disclosure. See, also, *Steckelberg v. Nebraska State Patrol*, 294 Neb. 842, 885 N.W.2d 44 (2016) (employee who was not given lateral transfer to position for which he was applicant was denied public records access to documents related to job interviews; denial of access affirmed on appeal based upon such records constituting confidential personnel records). Although a public records request and a discovery request made in the course of litigation are different matters, the confidential and protected nature of such personnel records as determined by the legislature under § 84-712.05(7) warrants consideration.

Even protected or privileged materials may be subjected to discovery under certain conditions. In particular, we note that a trial court has discretion in the matter of discovery where material is sought for impeachment purposes. See *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995). However, a witness may assert that information sought in discovery is privileged or protected and resist discovery. *Id*. And when "the claimed impeaching information is privileged there must be a showing that there is a reasonable ground to believe that the failure to produce the

- 6 -

information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken." *State v. Trammell*, 231 Neb. 137, 142, 435 N.W.2d 197, 201 (1989) (quoting *State v. Esposito*, 192 Conn. 166, 471 A.2d 949 (1984)). If such a showing is made, an in camera inspection of the claimed information can be made with the consent of the witness, and then if necessary, the information can be turned over to the defendant for purposes of cross-examination. See *id.* "If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having [his/her] testimony stricken in the event of refusal." *Id.* at 143, 435 N.W.2d at 201.

In the present matter, the State informed the district court and Tackett that it was under "a duty to disclose anything that reflects on the credibility of an officer," and that anything affecting his credibility would have to be turned over. Further, as pointed out by the State in its brief to this court, "there was a stipulated discovery order in the record which obliged the [S]tate to provide exculpatory evidence of whatever kind as part of a continuing process," and also, Tackett did not ask the court "to conduct an in camera review of the personnel file to determine whether there was anything that was potentially impeachment evidence nor did Tackett seek any other redress at the trial court level." Brief for appellee at 22.

The record supports the State's assertions. Further, Tackett failed to establish any reasonable ground to believe that the failure to produce the information requested was likely to impair his right of confrontation. See *State v. Trammell, supra.* Tackett had the opportunity to question Deputy Stenger and Sheriff Stukenholtz directly about the subject matter of his concern and had an opportunity to attack Deputy Stenger's credibility in several instances. Deputy Stenger testified under cross-examination at a preliminary hearing. Tackett took two depositions of Deputy Stenger, one of which occurred after the court's ruling on this motion. Tackett also took a deposition of Sheriff Stukenholtz. Finally, both of these witnesses were subject to cross-examination at trial. There were multiple opportunities for Tackett to address any concerns he may have had with regard to Deputy Stenger no longer being employed by the Saunders County Sheriff's Office.

The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion. *Breci v. St. Paul Mercury Ins. Co.*, 288 Neb. 626, 849 N.W.2d 523 (2014). Based on this record, we cannot say the district court abused its discretion by partially sustaining the State's second motion to quash.

## 2. ADMISSION OF EXHIBITS

Tackett claims the district court erred in admitting exhibits 4, 5, 9, and 10 into evidence.

### (a) Exhibits 4 and 5--911 Audio CDs/Dispatch Logs

Exhibits 4 and 5 are CDs, each containing identical audio tracks numbered 1 through 84. The State, without referring to a specific exhibit, had the resident "authenticate his voice" in conversations with a 911 dispatcher on "five tracks on a DVD" (identified only as tracks 42, 46, 56, 67, and 70). When asked if those conversations encompassed "the full conversations [the resident] had with the 911 center on October 18, 2016," the resident responded, "Yes." Defense

counsel stated, "I'm going to object as to, I guess, the conversations." The court overruled the objection.

Exhibits 4 and 5 were subsequently offered and received through Deputy Malina's testimony. Deputy Malina testified that he was in charge of the 911 center, where he oversees dispatch communications, including making sure equipment is working correctly. When asked if he was responsible for producing copies of "transmissions from 911," he stated he personally did not make copies, rather he has other personnel make copies. Deputy Malina testified that he had reviewed a DVD pertaining to October 18, 2016, and agreed that it was a "true and accurate copy of the transmissions from [the] 911 center that day." He agreed that exhibit 4 was a "CD-R dated on the 18th of October 2016, dispatch log copy," and that it appeared to be "the same type of DVD" with "writings on it" as the copy he reviewed. Deputy Malina stated that exhibit 5 was a "CD" titled "Dispatch logs, dated the same date." Exhibit 5 was the CD which Deputy Malina had recently reviewed, and he testified it was a true and accurate copy of all the information from dispatch logs on October 18, 2016. When exhibit 4 was introduced, Tackett objected on the grounds of foundation, hearsay, and legal conclusion. When exhibit 5 was introduced, Tackett objected on foundation, hearsay, and relevance grounds. Tackett's objections to both exhibits were overruled.

Tackett pointed out to the district court, "I believe the county attorney indicated that there were 84 tracks on that particular DVD that they just offered, in Exhibits 4 and 5, and I think that they indicated that they wanted the [c]ourt to simply review five of those tracks[.]" The court responded that it would only listen to tracks 42, 46, 56, 67, and 70. Tackett also expressed concern about legal conclusions, stating "our biggest objection and legal conclusion has to do with track 56 . . . the other ones, frankly, not as large a concern." The court indicated it would disregard any legal conclusions, stating it "understands its purview and its purview alone to decide what the law is."

On appeal, Tackett claims the "State did not offer any testimony that the information contained in Exhibits 4 and 5 to [sic] establish any exception to hearsay or foundation as a business record." Brief for appellant at 17. He claims the State failed to provide a proper authenticating witness to establish that the information contained in the exhibit was made as part of regular business, and that Deputy Malina's testimony "was insufficient for foundational purposes." *Id*. The State contends, however, that the record does not show that the exhibits were offered or received as business records, and therefore "Tackett's argument is without merit." Brief for appellee at 23. The State asserts, "It appears they were offered more to prove [the resident's] state of mind and to show the 'chain' of events that night." *Id*.

We find it unnecessary to address the admissibility of exhibits 4 and 5 because even if the exhibits included inadmissible hearsay or lacked sufficient foundation, we conclude the admission of such exhibits into evidence was harmless. Generally, an "'erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.'" *State v. Ildefonso*, 262 Neb. 672, 686, 634 N.W.2d 252, 265 (2001) (quoting *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001)). In a bench trial of a law action, including a criminal case tried without a jury, erroneous admission of evidence is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's factual findings necessary for the

judgment or decision reviewed. *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000). An appellant must show that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through the use of erroneously admitted evidence in a case tried without a jury. *Id*. The appellant must show that the trial court made a finding of guilt based exclusively on the erroneously admitted evidence. *Id*. If there is other sufficient evidence to support the finding of guilt, the conviction will not be reversed. *Id*.

The admission of exhibits 4 and 5 was harmless because the audio recordings of the resident's conversations with the 911 dispatcher were cumulative to the resident's testimony about what he witnessed the evening of October 18, 2016. Prior to these exhibits being offered and received, the resident had already provided properly admitted testimony regarding (1) how many times he spoke with 911 and the general content of those calls on October 18, and (2) his observations of the interaction between Deputy Stenger and Tackett on and near his residence that night. The resident testified, "I called [911 or law enforcement] once, they called me back, and I believe I only called them one more time." He indicated he first called 911 after his initial encounter with Tackett on the porch, saying, "I called 911 to have a deputy come out and talk to [Tackett]." The resident also claimed to have made a second call to 911 after observing the deputy and Tackett in a "struggle." And, the resident testified that when he picked up Deputy Stenger in the field, he was "still talking to 911" and he let 911 know that he had the deputy. Finally, before authenticating the five tracks as his full conversations with the 911 center on October 18, the resident testified, without objection, that: (1) when he called 911, he understood he was speaking with a dispatcher who was familiar with the situation, (2) the dispatcher called him back, (3) when he called 911, he had identified himself and asked for a deputy, and (4) later when driving up the field, he was on the phone with 911, describing events as he saw them.

The district court heard ample testimony from different witnesses about their accounts of the events surrounding October 18, 2016. Thus, the court received other evidence, properly admitted, to support the verdicts. The record does not reflect, and Tackett does not establish, that the court "made a finding of guilt based exclusively" on exhibits 4 and 5. See *State v. Lara, supra*. The admission of exhibits 4 and 5 did not constitute reversible error.

### (b) Exhibit 9--Black Lighter

At trial, the State introduced exhibit 9, a black lighter, through Deputy Malina's testimony. When introduced, Tackett objected on "insufficient and proper foundation, lack of authentication, chain of custody." In his brief on appeal, Tackett's only argument is that there was an insufficient chain of custody established for the lighter to be received into evidence. Tackett's argument points to (1) contradictory testimony about whether Deputy Stenger gave Deputy Malina the lighter in the field or at the hospital, (2) contradictory testimony of Deputy Stenger and Tackett about whether Deputy Stenger returned the lighter to Tackett after the pat-down search, (3) the absence of information about whether the lighter was tagged for identification or secured, and (4) the chain of custody form's completion on November 2, 2016.

Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence. *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004).

An exhibit is admissible, so far as identity is concerned, when it has been identified as being the same object about which the testimony was given. *State v. Sexton*, 240 Neb. 466, 482 N.W.2d 567 (1992). It must also be shown to the satisfaction of the trial court that no substantial change has taken place in the exhibit so as to render it misleading. *Id.* As long as the article can be identified, it is immaterial in how many or in whose hands it has been. *Id.* Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers' tampering with the object. *State v. Tolliver*, *supra*.

Proof that an exhibit remained in the custody of law enforcement officials is sufficient to prove a chain of possession and is sufficient foundation to permit its introduction into evidence. *State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002). Further, the Nebraska Supreme Court has held that a defendant's challenge to the chain of custody goes to the weight to be given to the evidence presented rather than to the admissibility of that evidence. See *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990).

At trial, Deputy Malina identified exhibit 9 as the exact lighter given to him by Deputy Stenger. Deputy Stenger identified it as the lighter he found on Tackett's person during the pat-down search and later found when he walked to the bottom of the hill to pick up his body camera which had fallen off, and to get "the evidence [lighter and cell phone] that was where we rolled around on the ground." The State concedes "the precise chain of custody for the lighter is not very clear from the record," but argues the record reflects the lighter remained with law enforcement once Deputy Stenger picked it up from "the field where [Deputy Stenger] and Tackett ended up." Brief for appellee at 24. We agree.

The record lacks testimony to contradict Deputy Stenger's assertion that he retrieved the lighter at the bottom of the hill where he and Tackett had "rolled around on the ground" on October 18, 2016. Based on testimony of Deputies Stenger and Malina, the exchange of the lighter from Deputy Stenger to Deputy Malina happened that evening, either in the field or at the hospital. Regardless of the location of the exchange, there is nothing in the record to suggest the lighter did not remain with law enforcement from the time Deputy Stenger transferred the lighter to Deputy Malina. Deputy Malina was asked what he did with the lighter after it was given to him. He responded, "[I] [w]ould have secured it in my backpack that I had with my laptop. And then after we were done at the hospital, came back to the sheriff's office and placed it in a lockbox or the evidence lockers." He testified that he received the lighter on October 18, but would have put it in the evidence bag past midnight. To tag it into evidence, he wrote "Recovered by 90612" on the bag to indicate Deputy Stenger recovered the lighter.

Although the chain of custody form for the lighter, which kept track of when and who checked out evidence, was not made until November 2, 2016, there is nothing in the record to suggest the lighter was taken out of law enforcement's custody between October 18 and November 2. Also, nothing in the record refutes Deputy Malina's claim that the lighter had not been altered in any manner by anyone. Rather, the record shows the exhibit remained within law enforcement's custody, and that is sufficient to prove a chain of possession for foundation to admit the evidence. See *State v. Mather, supra*. Any remaining issues concerning the chain of custody go to the weight of the evidence, not its admissibility. See *State v. Bradley, supra*. We also note that the State asked

Tackett on cross-examination, "This is your lighter; right?" Tackett responded, "Yes." The district court did not abuse its discretion in receiving exhibit 9 into evidence.

## (c) Exhibit 10--Radio Messages Transcript

The State introduced the radio messages transcript from October 18, 2016, marked as exhibit 10, through Deputy Stenger's testimony. Described as a data entry, exhibit 10 included a reference to the call for service that Deputy Stenger received that night. The State informed the district court that the exhibit was redacted, saying, "Redactions, I was told by dispatch, were the items not related to this case or the entries not related to this case." When the exhibit was introduced, Tackett objected saying, "I'm going to object as to hearsay, foundation. Calls for speculation . . . it's not the original. It's not a complete document. Somebody has crossed off things on it." Tackett objected again on hearsay immediately after the court received the exhibit. Tackett's objection did prompt the court to ask generally about the redactions, and in response the State claimed the information redacted was not related to this case.

On appeal, Tackett argues the State "failed to offer proper foundation as to the information contained in Exhibit 10 and any hearsay exception. No testimony was offered as to who created or maintained the Exhibit; when the Exhibit was prepared or otherwise authenticate the document. Additionally, items were redacted, with no showing of privilege." Brief for appellant at 21.

The State concedes the lack of foundation, stating, "[W]e cannot say that we think exhibit 10 was properly admitted as there is no explanation of what is what and who is who . . . [n]or do we know how this document was created or by whom. In short, we think foundation for it was lacking." Brief for appellee at 26-27. However, the State maintains that the lack of foundation "does not mean there is reversible error." *Id.* at 27. We agree.

Keeping in mind the principles governing the erroneous admission of evidence and harmless error discussed earlier, we note that exhibit 10 appears to present a rough timeline of events generally described in data entry form, which was cumulative to certain testimony offered by Chief Jackson, the resident, and Deputy Stenger about the general timeline of events surrounding October 18, 2016. Entries on exhibit 10 not cumulative to any prior testimony, such as "TK 21 ENROUTE" or "NOW *98 FROM *89 TO 612 BACK ENRT D3" are insubstantial and meaningless without an explanation, which the record shows was not provided. Further, the State's use of exhibit 10 during direct examination of Deputy Stenger was limited to refreshing his recollection so he could testify about when he received calls for service and backup. Neither the record, nor Tackett's assertions, establishes that the court based its finding of Tackett's guilt "exclusively" on exhibit 10. See *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000). Finally, as we concluded previously, the court received ample other evidence to support the verdicts. Even if inadmissible on the basis of insufficient foundation or inadmissible hearsay, we conclude the admission of exhibit 10 was harmless and therefore did not constitute reversible error.

## 3. SUFFICIENCY OF EVIDENCE

Tackett assigns there was insufficient evidence to convict him of third degree assault on an officer under Neb. Rev. Stat. § 28-931 (Reissue 2016), and resisting arrest under Neb. Rev. Stat. § 28-904 (Reissue 2016).

(a) Third Degree Assault on Peace Officer

A person commits the offense of third degree assault on an officer if "[h]e or she intentionally, knowingly, or recklessly causes bodily injury" to "a peace officer" and the offense is committed while such officer "is engaged in the performance of his or her official duties." See § 28-931. Neb. Rev. Stat. § 28-109 (Reissue 2016) defines various terms used in the Nebraska Criminal Code. As relevant here, it defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." § 28-109(4). Section 28-109 does not provide a definition for "intentionally" or "knowingly," but § 28-109(20) does define "recklessly" as:

> [A]cting with respect to a material element of an offense when any person disregards a substantial and unjustifiable risk that the material element exists or will result from his or her conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

Tackett does not dispute that Deputy Stenger was an officer engaged in the performance of his official duties. Tackett first argues the State did not prove his conduct was intentional, knowing, or reckless. In support of this assertion, Tackett claims there was no evidence that he punched, kicked, physically struck, or threatened Deputy Stenger, and he argues Deputy Stenger did not see him in possession of the lighter during the altercation "or any other weapon to cause harm to the officer." Brief for appellant at 8. Tackett claims he was "only trying to leave the scene, got up and twisted away from [Deputy] Stenger, and continued to flee the area." *Id*.

However, Tackett admitted to not getting into the patrol vehicle upon Deputy Stenger's request he do so while his identification was being verified. Instead of cooperating, while Deputy Stenger "had ahold of [Tackett's] sleeve on the right side of the hoodie that the [resident] had given him," Tackett "made the decision that [he] was going to leave the area," so he "pulled the hoodie up over [his] head" and Deputy Stenger "lost control of [him]" and "[Tackett] took off running across the road" despite Deputy Stenger telling him to stop. Deputy Stenger caught up with Tackett and a "struggle on the ground" ensued. Tackett then got up and Deputy Stenger placed him in a "bear hug," following which Deputy Stenger felt a "sharp pain in his left hand."

Even if Tackett did not intentionally or knowingly cause physical pain to Deputy Stenger, there was sufficient evidence to establish that Tackett's actions constituted reckless conduct which resulted in Deputy Stenger having physical pain. Tackett slipped out of the hoodie and twisted away from the deputy and took off running in the course of an investigation. Tackett then struggled with the deputy on the ground, and then the deputy felt pain in his hand during the "bear hug." No law-abiding person would have slipped out of clothing and taken off running during an officer's questioning and command to stop. Additionally, when subsequently physically apprehended by Deputy Stenger and held in a "bear hug," all resistance should have ceased. Instead, Tackett continued to struggle with Deputy Stenger, during which Deputy Stenger felt a sharp pain in his left hand. Tackett's conduct was a gross deviation from the standard of conduct that a law-abiding person would have observed if in Tackett's situation.

Tackett further claims the State did not offer evidence to prove he caused any bodily injury to Deputy Stenger. Tackett contends, "Any distress or pain suffered by [Deputy] Stenger was caused by his own current physical condition or prior injury suffered to his hand." Brief for appellant at 10. He notes that Deputy Stenger previously broke his left hand years ago, "drove himself to the hospital as he was suffering cardiac arrest symptoms from activities and exertion of chasing after [him]," and did not receive medical treatment for any burn. *Id*. at 9. He further claims that Deputy Malina's photographs taken at the hospital that night, received as exhibits 6 and 7, did not show "any injury or marks to [Deputy] Stenger's hand." *Id.* at 10.

According to Deputy Stenger, after the "struggle on the ground," Tackett got up, and Deputy Stenger was behind Tackett attempting to restrain him. Tackett testified Stenger placed him in a "bear hug" and that both his hands and Deputy Stenger's hands were in front of him at that time. Deputy Stenger said that when he had Tackett in a "bear hug," he felt a tug on his belt and felt a "sharp pain in his left hand," so he decided to take Tackett to the ground. Deputy Stenger testified about this part of the incident as follows:

> [State:] You indicated you had a sharp pain in your hand?
> A. Yes.
> Q. Can you describe that[?]
> A. At the time when we were fighting, that I thought that what was going through my mind was that did I miss a knife? Why am I being -- why is this pain here? Am I being cut with something? To me I thought I missed a knife, so that's why I just took him down to the ground.
> . . . .
> A. When we went down to the ground, that's when I saw a lighter pop out and I looked at my hand and saw a burn mark, and that's when I realized I was being burned.

Deputy Stenger testified that he felt pain in his left hand at the hospital that same night. He claimed a blister had developed on his left hand and he was given a "brace splint" to protect his hand. He said he visited a different hospital a few weeks later, and took the medical advice to continue to wear the splint if he felt any pain.

As noted previously, bodily injury includes physical pain. See, § 28-109(4); *State v. Melton*, 239 Neb. 576, 477 N.W.2d 154 (1991). The Nebraska Supreme Court has stated, "We have never required that an assault culminate in visible markings in order to be labeled as such." *State v. Green*, 240 Neb. 639, 641, 483 N.W.2d 748, 750 (1992) (finding record supported two convictions of third degree assault on officer). In this case, Deputy Stenger testified that he experienced sharp pain, initially thinking it was a knife, but subsequently concluding he had been burned by the lighter.

The standard of review for an insufficient evidence claim dictates this court does not reweigh the evidence or critique the credibility of witnesses. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016). The evidence, viewed in the light most favorable to the prosecution, was sufficient to establish Tackett intentionally, knowingly or recklessly caused bodily injury to a peace officer. The district court did not err in finding sufficient evidence for the conviction of third degree assault on an officer.

(b) Resisting Arrest

Tackett argues there was insufficient evidence to convict him of resisting arrest because the State offered no evidence to show he interfered with any arrest or that he was being placed under arrest. He claims Deputy Stenger "was not attempting to arrest [Tackett] during the altercation." Brief for appellant at 12.

A conviction for the offense of resisting arrest under § 28-904(1)(a) requires the State to prove the defendant, "while intentionally preventing or attempting to prevent a peace officer, acting under color of his or her official authority, from effecting an arrest of the actor . . . [u]ses or threatens to use physical force or violence against the peace officer or another." An arrest is taking custody of another person for the purpose of holding or detaining him or her to answer a criminal charge, and to effect an arrest, there must be actual or constructive seizure or detention of the person arrested. *State v. White*, 209 Neb. 218, 306 N.W.2d 906 (1981).

This court has indicated that no verbal advisement of an attempted arrest before a defendant's physical resistance is necessary for the offense to be considered resisting arrest. See *State v. Heath*, 21 Neb. App. 141, 838 N.W.2d 4 (2013). See, also, *State v. Ellingson*, 13 Neb. App. 931, 703 N.W.2d 273 (2005) (noting officer's actions to effectuate physical control over defendant constituted an attempt to arrest, without any verbal announcement of arrest). In *Heath*, the defendant engaged the officer in a physical altercation in which the defendant resisted the officer's attempts to gain control, actively attempted to gain physical control of the officer, and placed his hand on the officer's holstered service weapon. The officer suffered physical injury. The officer acknowledged that he did not, in the midst of the physical altercation, verbally advise the defendant that he was under arrest or that the officer was attempting to arrest him. This court found the evidence was sufficient to support a conviction under § 28-904(1)(a).

Viewing the evidence in a light most favorable to the State, we find a rational trier of fact could have found beyond a reasonable doubt that Tackett intentionally prevented or attempted to prevent Deputy Stenger from effecting an arrest of Tackett. Deputy Stenger said he was informed about probable cause to arrest Tackett. At the residence, Deputy Stenger believed Tackett gave him a false identification and he directed Tackett to sit in the patrol vehicle so he could check the information. Deputy Stenger told Tackett he thought he was the wanted individual from Bomgaars. Tackett testified that Deputy Stenger was holding him by the sleeve of the sweatshirt, and when Tackett decided to leave he reached down with both hands and pulled the sweatshirt over his head. Tackett then took off running.

Deputy Stenger never verbally announced Tackett was under arrest. However, Deputy Stenger's response escalated from mere questioning to effectuating control over Tackett when Deputy Stenger held Tackett by the sleeve of the sweatshirt Tackett was wearing, which according to Tackett's testimony, happened sometime after the deputy had first ordered Tackett to sit in the deputy's patrol vehicle. Further, once Tackett escaped the deputy's grip, Deputy Stenger evidenced actions to regain physical control over Tackett.

After Tackett escaped Deputy Stenger's grip and took off running, Deputy Stenger said he ordered Tackett to stop, but Tackett did not comply. A physical altercation, which Deputy Stenger characterized as a "ground fight," happened once Deputy Stenger caught up to Tackett in the field. He said he told Tackett to stop resisting and had him in a hold. He testified Tackett continued to

- 14 -

"struggle and fight with me," and he felt a tug at his gun belt. Based on testimony developed by the State, Tackett resisted Deputy Stenger's attempts to gain control. These facts are similar to those in *Heath*, noted above.

After Deputy Stenger felt pain in his hand, he took Tackett to the ground to try to control him. Eventually, Deputy Stenger was able to place Tackett's hands behind Tackett's back, but when Deputy Stenger tried to retrieve handcuffs, he lost control. Deputy Stenger again felt a tug at his belt, and became afraid Tackett was going for his (the deputy's) gun. Tackett broke free and ran away again, despite the deputy's order to stop. Deputy Stenger said he caught up with Tackett over the hill and handcuffed him and handed custody of Tackett over to another law enforcement officer once backup arrived.

The evidence adduced, when viewed favorably to the State, was sufficient to support a rational trier of fact's conclusion that Deputy Stenger attempted to effect an arrest of Tackett, which Tackett intentionally prevented or attempted to prevent. The district court did not err in finding the evidence sufficient to convict Tackett of resisting arrest.

### 4. EXCESSIVE SENTENCES

Tackett claims his sentences are excessive. Tackett was convicted of third degree assault on an officer, a Class IIIA felony. See § 28-931(2). A Class IIIA felony is punishable by up to 3 years' imprisonment and 18 months postrelease supervision, a $10,000 fine, or both; a minimum of 9 months' postrelease supervision is required if imprisonment is imposed. See Neb. Rev. Stat. § 28-105 (Reissue 2016). Tackett was also convicted of obstructing a police officer, resisting arrest, and two counts of false reporting, all of which were Class I misdemeanors. See, Neb. Rev. Stat. § 28-906(3) (Reissue 2016); § 28-904(3)(a); Neb. Rev. Stat. § 28-907(2)(a) (Reissue 2016). Class I misdemeanors are punishable by not more than 1 year of imprisonment, a $1,000 fine, or both. See Neb. Rev. Stat. § 28-106 (Reissue 2016). For each of the five convictions, the court imposed concurrent sentences of one year of imprisonment in county jail, followed by 12 months of postrelease supervision. As indicated above, a minimum of 9 months of postrelease supervision is required when imprisonment is imposed for a Class IIIA felony.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Trice*, 292 Neb. 482, 874 N.W.2d 286 (2016). Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *Id.* An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.* Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Berney*, 288 Neb. 377, 847 N.W.2d 732 (2014).

Tackett's sentences were within the statutory limits and, therefore, will be affirmed if there was no abuse of discretion. The presentence investigation report (PSR) showed Tackett was 37 years old and unemployed at the time of the offenses. He had completed high school and 1 year of

college, and leisure activities were limited due to incarceration except for participation in personal devotionals, bible study groups, and AA meetings. Tackett lacks prosocial companions as all close friends have prior criminal convictions. He began using alcohol, marijuana, and methamphetamine at age 14. The PSR noted Tackett had an ongoing struggle with using methamphetamine, and his last use was October 17, 2016. Tackett has a lengthy criminal history as an adult, including convictions for failure to register as a sex offender, driving under suspension (twice), driving under the influence (three times), unauthorized use of a credit card, forgery (twice), third degree assault, theft, attempted drug possession, and several traffic-related offenses. In addition, the PSR noted three pending criminal cases in Iowa: one for second degree theft; one for fourth degree theft (according to Tackett, he did not appear in court and a warrant has been issued for his arrest); and one for criminal mischief. Tackett has been placed on probation as an adult (he reports that he has been on probation twice as an adult, but his criminal history notes 5 terms of probation: 2003, 2006, 2007, 2009, and 2013). For his 2013 probation, a violation was filed in January 2014, and a warrant was issued in April 2015; at the time of the PSR, Tackett was on "abscond status."

As part of the presentence investigation for his current convictions, the probation officer conducted a level of service/case management index. Tackett was assessed as an overall "very high" risk to the community and to recidivate. While Tackett was apologetic to Deputy Stenger and indicated to the court that he takes responsibility for his actions, the probation officer questioned Tackett's intentions and whether he would remain compliant with a probation order in light of his present "abscond status" from a probationary term.

Tackett argues the court did not consider the nature of the crime or harm caused. However, under *State v. Trice, supra*, the factors serve as a discretionary guideline for the sentencing judge. The district court emphasized two compelling reasons for imprisonment were that a lesser sentence would depreciate the seriousness of the crime and Tackett's prior record presented substantial risk that he would reoffend while on probation. The court stated it found imprisonment appropriate on review of the PSR and all facts and relevant information it could consider. Having reviewed the record and considered the relevant factors, we find that Tackett's sentences are not excessive.

Tackett additionally argues the 383 days' credit provided to him for time already served in jail shows the "implicit concept that he had served enough time pending trial." Brief for appellant at 23. As noted, the sentence for each conviction was within the prescribed statutory ranges, with the sentence for the felony conviction well under the statutory maximum of 3 years' imprisonment. Although Tackett served 18 more days than sentencing required, the sentencing and credit provided do not amount to an excessive sentence. We find no abuse of discretion in the sentences imposed by the district court.

### 5. INEFFECTIVE ASSISTANCE OF COUNSEL

Tackett claims he received ineffective assistance of trial counsel. He asserts his trial counsel was ineffective in failing to (1) present evidence to contradict that Deputy Stenger suffered bodily injury, (2) present evidence to attack or refute the credibility of Deputy Stenger's testimony, and (3) investigate and present witnesses on Tackett's behalf, prepare a proper trial strategy, and present an adequate defense.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's

performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016). The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.* To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *State v. Vanderpool*, 286 Neb. 111, 835 N.W.2d 52 (2013). To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Newman*, 290 Neb. 572, 861 N.W.2d 123 (2015). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Jackson*, 275 Neb. 434, 747 N.W.2d 418 (2008).

Tackett's initial court-appointed attorney made a motion for leave to withdraw as Tackett's attorney on May 25, 2017, due to a conflict of interest, which the district court granted on May 26. The court then appointed new counsel for Tackett; it is this counsel who is the subject of Tackett's claims. Tackett is represented on direct appeal by different counsel than the second court-appointed counsel who represented him at trial.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Newman, supra*. Otherwise, the issue will be procedurally barred. *Id.* However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.* An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *Id.*

Allegations of how the defendant was prejudiced by trial counsel's allegedly deficient conduct are unnecessary to the specific determination of whether a claim of ineffective assistance of counsel can be determined based on the record on direct appeal. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). However, general allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction proceeding, appellate counsel must present a claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *State v. Mendez-Osorio, supra*.

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015). An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if

the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *State v. Filholm, supra*.

### (a) Presenting Evidence to Contradict Deputy Stenger and Attack His Credibility

In his brief, Tackett seems to collectively address two of his claims of ineffective assistance of counsel: that his trial counsel failed to contradict and attack the State's evidence and Deputy Stenger's testimony relating to Deputy Stenger's injury and medical history. Tackett claims that an element in dispute at trial was whether he intentionally or recklessly caused any bodily injury to Deputy Stenger. Tackett argues his trial counsel was ineffective for not providing evidence about medical records or treatment of Deputy Stenger's alleged bodily injury. He argues this should have been done because the State provided his trial counsel with Deputy Stenger's medical records through discovery and his trial counsel deposed doctors endorsed as the State's witnesses and served a subpoena on one doctor to appear at trial. Tackett further suggests evidence should have been presented from medical records about Deputy Steger's "known heart condition or general physical well-being," because Deputy Stenger testified at trial about symptoms and treatment for cardiac arrest and prior injuries to his left hand. Brief for appellant at 26.

Tackett is clear about his position that trial counsel should have used medical records and questioned doctors to contradict the State's evidence of Deputy Stenger's bodily injury and to impeach Deputy Stenger's testimony accordingly. However, Tackett is unclear about the actual content of the medical records its trial counsel received, stating they "*may* have contradicted or impeached the testimony of [Deputy] Stenger regarding the issue of any bodily injury." *Id.* at 25 (emphasis supplied). Further, Tackett does not state what the likely testimony of doctors would have been. As the State points out, "We do not know . . . what evidence [Tackett] has in mind, or what evidence may even exist such that it should have been adduced at trial." Brief for appellee at 31. We conclude that Tackett's failure to present these claims with enough particularity procedurally bars a future postconviction proceeding upon them. See *State v. Mendez-Osorio, supra*.

Aside from the lack of clarity of Tackett's claims, we note the record nevertheless refutes any claim Tackett could have made. As stated previously, the offense of third degree assault on an officer requires, in part, a showing that the offender caused "bodily injury to a peace officer." See § 28-931. Deputy Stenger testified that when he had Tackett in a "bear hug," he felt a "sharp pain in his left hand." Tackett's trial counsel could not have been deficient for not presenting evidence to attack the credibility of this testimony, because medical reports or testimony from doctors could not have contradicted Deputy Stenger's claim about pain in his left hand when interacting with Tackett. Visible markings from an injury are not required to establish an assault. See *State v. Green*, 240 Neb. 639, 483 N.W.2d 748 (1992). And, Deputy Stenger's claim of feeling a "sharp pain" satisfies the relevant statutory definition for "bodily injury." See § 28-109(4) ("Bodily injury shall mean physical pain").

Tackett's claim for ineffective assistance of counsel as to these allegations against his trial counsel fail because the record establishes his trial counsel's performance was not deficient. See *State v. Filholm, supra*.

### (b) Investigating and Presenting Witnesses, Preparing Trial Strategy, and Presenting Adequate Defense

Tackett does not elaborate on his third allegation that his trial counsel failed to investigate and present witnesses on Tackett's behalf, prepare a proper trial strategy, and present an adequate defense. While listed as a separate claim of ineffective assistance of counsel, Tackett appears to generally argue only that medical evidence should have been presented to challenge "the issue of the claimed bodily injury of [Deputy] Stenger, which resulted in the sole felony conviction by the District Court." Brief for appellant at 27. We find Tackett's third allegation against his trial counsel's performance to be repetitive of the claim already discussed and insufficient to state a claim of ineffective assistance of counsel. Accordingly, the allegation is not preserved for later review because it is merely a general allegation that trial counsel performed deficiently or was ineffective. See *State v. Filholm, supra.*

### VI. CONCLUSION

For the foregoing reasons, we affirm Tackett's convictions and sentences.

AFFIRMED.